# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| JENNIFER L. POLLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:08-CV-158 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Jennifer L. Polly appeals to the District Court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the reasons set forth herein, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Polly applied for DIB and SSI on May 2, 2005, alleging that she became disabled as of April 30, 2005. (Tr. 71-75, 408-11.) The Commissioner denied her applications initially and upon reconsideration. (Tr. 27-28, 53-55, 57-61, 400-07.) On July 9, 2007, Administrative Law Judge (ALJ) Terry L. Miller conducted a hearing at which Polly, who was represented by counsel, and vocational expert ("VE") Charles McBee testified. (Tr. 432-74.) On July 26, 2007, the ALJ rendered an unfavorable decision to Polly (Tr. 17-26), which became the Commissioner's final decision after the Appeals Council denied her subsequent request for

---

[1]All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

review (Tr. 5-13).

Polly filed a complaint with this Court on June 19, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.) She contends that the ALJ's step five determination was not supported by substantial evidence and that the ALJ improperly evaluated the medical opinion of her treating psychiatrist, Dr. Frank Cyran. (Opening Br. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 12, 16.)

## II. FACTUAL BACKGROUND[2]

### A. General Background

Polly was thirty-three years old at the time of her hearing decision. (Tr. 71.) She has a high school education and past work experience as a computer web designer, graphic designer, assembler of small products, and home health aide in a group home. (Tr. 77-78, 82, 86, 133.) She alleges impairments of bipolar disorder, NOS; post-traumatic stress disorder; intermittent explosive disorder; and daily mood swings. (Tr. 76; Opening Br. 2.)

### B. Summary of Relevant Medical Evidence

In May 1992, when she was seventeen years old, Polly was hospitalized for about two weeks for suicidal ideation and "wanting to hurt others." (Tr. 144-46.) Her discharge diagnosis was brief reactive psychosis. (Tr. 146.) About a month later, she was readmitted to the hospital for depression. (Tr. 134-36.) During both stays, Polly admitted that she previously used drugs, but the screens were negative. (Tr. 134-35, 144.) She was discharged after approximately two weeks with a diagnosis of bipolar disorder. (Tr. 136.) Between hospitalizations and for a few months afterwards, Polly was treated with medicines and counseling at the offices of Ronald J.

---

[2] In the interest of brevity, this opinion recounts only the portions of the 475 page record that are necessary to the decision.

2

Pancner, M.D. (Tr. 162-69.)

Polly next sought treatment with Dr. Pancner in 1999, when she was twenty-four years old, because she believed that she was a "little manic." (Tr. 159-61.) Dr. Pancner's diagnosis was Bipolar Disorder Type II versus Type I by history, and he assigned a Global Assessment of Functioning ("GAF") score[3] of 75. (Tr. 161.)

In February 2001, Polly was sent to the Northeastern Center for anger management and counseling after a domestic dispute with her husband the previous April. (Tr. 333-37.) She was diagnosed with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct and intermittent explosive disorder (provisional). (Tr. 333.) Her GAF scores, both current and for the year, were fifty. (Tr. 333.) She missed some counseling appointments but attended in June and July. (Tr. 325, 327.)

In September 2001, Polly was voluntarily hospitalized at the Elgin Mental Health Center in Illinois after being discovered wandering the streets with her three children and exhibiting delusional behavior. (Tr. 170-213.) She was found to have no insight or judgment into her situation and was hospitalized for four weeks. (Tr. 170, 179.)

In October 2001, following her hospitalization, Polly returned to Indiana and again

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21 to 30 indicates that behavior is considerably influenced by delusion or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. *Id.* at 34. A GAF score of 31 to 40 reflects some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.* And, a GAF score of 71 to 80 reflects that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors" and indicates "no more than slight impairment in social, occupation, or school functioning." *Id.*

sought treatment at the Northeastern Center, where she initially saw Dr. Cruz-Diaz, a psychiatrist, and Ms. Brenda Stoops, a counselor. (Tr. 311-15.) Ms. Stoops reported in November that Polly was doing better and wanted to regain custody of her children, and that she was taking her medication and following through with counseling. (Tr. 310-11.) Diagnoses in January, April, and July 2002 indicated Bipolar Disorder, Type I, Manic; Adjustment Disorder with Mixed Disturbance of Emotions and Conduct; and current and yearly GAF scores of twenty-five and fifty, respectively. (Tr. 286, 297, 304.)

Polly began seeing Dr. Frank Cyran that April, and in July he reported that her medication was helpful, her mood was stable, and she was not abusing drugs. (Tr. 290, 294.) That July, she also began seeing a different counselor, Ronald Chupp, who reported in August that Polly was stable on her medicines and coping very well with the stress of her child custody issues. (Tr. 285, 291.) In an August 2002 letter to an outside agency, Mr. Chupp indicated that Polly's bipolar disorder was easily managed with medication and that she was using the medications as prescribed. (Tr. 286.) He described her symptoms as "very stable with absolutely no indication of any mood or behavioral disturbances." (Tr. 284.) He further opined that there was nothing to preclude her from providing more than an adequate household for her children. (Tr. 284.)

In October 2002, Polly saw Dr. Cyran again and told him that she had been doing fine, that her mood was stable, and that she had no problem with the medications. (Tr. 281.) She had begun working four hours per day for the group home and was in the process of trying to get her children back. (Tr. 281.) He found that she was improving. (Tr. 281.) She also continued to see Mr. Chupp, who reported that Polly had shown no sign of anger or aggression since being

4

stabilized on medication. (Tr. 278-79.) Polly saw Dr. Cyran in August and October 2003 and January 2004, and although he noted some problems, he continued to report improvement. (Tr. 261, 264, 266.)

In June and December 2004 and in April 2005, Polly saw Erin Rivera, a nurse practitioner, reporting that she was eating and sleeping well, denying any difficulties, and indicating that the medicines were working well. (Tr. 243, 251, 255.) On April 20, 2005, Polly told Ms. Rivera that she was doing "OK" but had troubles with stress and anxiety. (Tr. 242.) Polly also explained that she quit her job because she "can't do it any more" and that she "can't take care of [her] own problems." (Tr. 242.)

On June 28, 2005, Dr. Sherwin Kepes performed a psychological consultative exam for the state agency. (Tr. 214-17.) Dr. Kepes observed that Polly was tense, depressed, and tearful. (Tr. 215.) After conducting a mental status examination, Dr. Kepes found that Polly did not have any specific problems with cognition or mentation, that her understanding of arithmetic was clearly adequate, and that she needed no supervision in the management of her funds. (Tr. 217.) He opined that since her more recent hospitalization, Polly was evidencing more signs of depression, perhaps related to situational stressors of her child custody difficulties. (Tr. 217.) Dr. Kepes also found that some of Polly's behavior indicated possible Anxiety and Obsessive-Compulsive processing, and he diagnosed Bipolar I Disorder, Most Recent Episodic Manic with Psychotic Features, and rule out Anxiety Disorder, NOS, with a current GAF of fifty. (Tr. 217.)

Polly also visited Ms. Rivera in June 2005, stating that she needed a letter for child support purposes explaining that she was not working due to stress. (Tr. 240.) In August, Polly saw Dr. Cyran, crying throughout the interview and reporting that she was "okay," although she

5

was experiencing depression and questioned whether her medications were helping. (Tr. 233.) A month later she saw Ms. Rivera, reporting that she was sleeping and eating poorly. (Tr. 379.)

On October 24, 2005, Dr. Cyran completed a "Report of Psychiatric Status" for Social Security. (Tr. 339-45.) His diagnosis was Bipolar, NOS, with a current GAF of fifty and her highest for the past year at fifty. (Tr. 339.) He noted that she had last worked in 2002 for about two years full time, and she stopped because "she couldn't handle it, negative, complaining, emotional[,] and frequent absences." (Tr. 339.) He remarked that she was crying throughout the interview, that she perseverates on her children, and that her thought processes were perseverative.[4] (Tr. 340.) In regard to the current specific manifestations of her mental disorder, Dr. Cyran indicated that Polly stopped working in April 2005 due to stress on the job, was presently tearful and depressed, felt like her mind was not functioning, obsessed about her children, and had problems with focus and concentration. (Tr. 340.)

With respect to the course of her disorder, Dr. Cyran stated that Polly had at least several years of difficult functioning as a parent and an employee despite psychotherapy and medicine management. (Tr. 341.) On the mental status examination, he noted that she had problems with abstract thinking and demonstrated mild paranoia. (Tr. 342.) He also found that she would have problems with focus and concentration reducing performance and increasing risk of damage to people or property and leading to frequent absences. (Tr. 343.) In regard to stress tolerance, Dr. Cyran remarked that the last time she worked she was inconsistent, could not handle job stress, and had frequent absences. (Tr. 343.) He further stated that her prognosis was fair for the long

---

[4] "In clinical psychology, [perseveration means] the uncontrollable repetition of a previously appropriate or correct response, even though the repeated response has since become inappropriate or incorrect." STEDMAN'S MEDICAL DICTIONARY 1466-67 (28th ed. 2006).

6

term with response to treatment, and that currently she was depressed with no signs of mania. (Tr. 344.) He reported that her compliance with treatment was good. (Tr. 344.)

In July 2005, state agency doctor, Dr. J. Gange, found that Polly had no severe mental impairment because her disorder required no recent psychological treatment and her work information was entirely within normal limits in that she quit her job and was found to be eligible for rehire. (Tr. 218-31.) Another state agency physician, Dr. B. R. Horton, later affirmed that opinion. (Tr. 218.)

Polly saw Ms. Rivera in February, April, and June 2006 and reported continuing problems, but Ms. Rivera noted that she was improving. (Tr. 367-68, 373.) A Medical Service Plan of April 2006 found a primary diagnosis of Bipolar Disorder, NOS, with a current GAF of fifty. (Tr. 370.)

Polly again visited Dr. Cyran in August 2006. (Tr. 366.) He found that she was fluctuating from hyper to mixed episodes and that she was constantly ruminating about things. (Tr. 366.) He also related that she tried to work, but her unstable emotions were disruptive. (Tr. 366.) His assessment was unchanged Bipolar, NOS (possibly mixed). (Tr. 366.) He continued her current medications, and he noted that she was not capable of gainful employment. (Tr. 366.)

Ms. Rivera indicated in September and November 2006 and February and March 2007, noting that Polly was stable but had problems with her children. (Tr. 350, 357, 360, 365.) In November 2006, Polly was assigned a GAF score of fifty, and in April 2007, she had diagnoses of Bipolar Disorder, NOS; Generalized Anxiety Disorder; and a current GAF of fifty. (Tr. 352, 364.)

7

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. *The ALJ's Decision*

On July 26, 2007, the ALJ rendered his decision. (Tr. 17-26.) He found at step one of the five-step analysis that Polly had not engaged in substantial gainful activity since her alleged onset date. (Tr. 19.) At step two, he concluded that Polly had the following severe impairments: bipolar disorder, generalized anxiety disorder, intermittent explosive disorder, and history of

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

9

polysubstance abuse. (Tr. 19.) The ALJ then at step three determined that Polly's impairments or combination of impairments was not severe enough to meet a listing. (Tr. 20.) Before proceeding to step four, the ALJ found Polly's subjective complaints "not entirely credible" (Tr. 23) and assigned her the following RFC:

> [T]he claimant is able to perform simple, routine, repetitive tasks that do not involve a fast-paced production environment, cannot tolerate to do more than one to three step tasks, cannot tolerate more than occasional workplace changes, cannot tolerate more than brief and occasional interactions with others, and cannot tolerate making more than simple work-related decisions.

(Tr. 20.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Polly was unable to perform her past relevant work. (Tr. 25.) The ALJ then concluded at step five, based on the VE's testimony, that Polly could perform a significant number of other jobs within the economy, including hand packager, store laborer, and kitchen helper. (Tr. 25.) The ALJ noted counsel's objection to the VE's methodology but found "no reason to discredit or to not accept the [VE's] testimony." (Tr. 26.) Therefore, Polly's claim for DIB was denied. (Tr. 26.)

*C. The ALJ's Step Five Determination Will Be Remanded*

Polly contends that the ALJ's determination at step five is not supported by substantial evidence because the VE's testimony, which the ALJ relied upon, lacked an adequate foundation, and the ALJ did not perform his duty of conducting an inquiry into the reliability of the VE's methodology. Polly's argument has merit.

1. The VE's Testimony

The ALJ posed a hypothetical to VE Charles McBee whether a person of Polly's age, education, and background could perform a significant number of jobs in the regional or national

economies if the person had no exertional limitations but was limited to simple, routine, repetitive tasks (meaning one to three step tasks) not performed in a fast-paced production environment; and involving only simple, work-related decisions, occasional workplace changes, and only occasional brief interactions with others. (Tr. 464-66.) The VE testified that the hypothetical person would be able to perform a significant number of jobs, including hand packager (500-750 jobs regionally), stores laborer or parts-picker (1,500-2000 jobs regionally), and kitchen helper (1,000-1,500 jobs regionally). (Tr. 466.) According to the VE, there would likewise be no work available to Polly if the ALJ assumed her testimony was credible and supported by the evidence of record, due to her problems concentrating, panic attacks, manic episodes, and need for time off at least once a month. (Tr. 466-67.)

Polly's counsel then examined the VE. (Tr. 467.) Counsel first inquired if there would be any work for a person the same age, education, and work experience as Polly who missed work at least two to three days per month due to depressive episodes. (Tr. 467.) The VE replied that missing more than one day per month would prevent competitive employment. (Tr. 467.)

Next, counsel questioned the VE about how he reached his estimates of the number of hand packager, stores laborer, and kitchen helper jobs in the region. (Tr. 467.) The VE testified that in determining the number of jobs in the regional economy, he used the Indiana Work Force Development Labor Force's estimates. (Tr. 467.) When counsel asked whether these estimates provided job numbers based on Dictionary of Occupational Titles (DOT) number, the VE testified that they do not. (Tr. 468.) He explained, "I look up and interpret to what, how many jobs are there and in that particular county and how those jobs are performed and extracted those numbers from that data." (Tr. 468.) Then counsel inquired whether that was the only source,

11

and the VE testified that he compared the U.S. Department of Labor or bureau statistics using the associated numbers and that they are categorized in all occupational areas. (Tr. 468.) When asked how he extrapolated his numbers from the Standard Occupational System (SOC) classifications containing many DOT numbers, he testified that there is a corresponding relationship between the DOT numbers. (Tr. 468-69.) He elaborated that "one SOC number may have ten DOT codes within it. I would look at those separate numbers, divide those up and see how, just what the labor market is saying in terms of those particular jobs." (Tr. 469.) Counsel further pressed the VE to explain how he divided these numbers, and he testified that "it's an estimate looking at different jobs, looking at what jobs are available in the region, looking at the labor movement or shifts from year to year, and dividing up those jobs for that category." (Tr. 469.) He added, "Again the methodology is not an exact science. However, . . . it is our best estimate as to the labor force." (Tr. 469.)

When counsel inquired if his methodology was published or peer reviewed, he stated that it is his own method and not one that has been published. (Tr. 469-70.) The VE then added that he did market surveys that produced the numbers he testified to, and that in collaboration with other vocational experts, he did "random sampling . . . of certain jobs to find out . . . exactly what's going on in the marketplace." (Tr. 470.) Counsel persisted in the inquiry into the VE's methodology, which the ALJ ultimately interrupted.

> Q. Were there market surveys for any of these particular jobs? The hand packager, stores laborer, kitchen helper?
>
> A. Market surveys I'm sure yes and as well as again, looking at the numbers from the U.S. Department of Labor and again, interpreting those numbers based on population, based on employment numbers, comparing those numbers for Ohio, Michigan, and Indiana and so we've been able to look at those numbers and say that yes, there are a certain amount of jobs that

12

> exist of this nature or of this particular category in the region.
>
> Q. Okay. Well, I mean how did you get the hand packager specifically? What method did you –
>
> ALJ: Mr. Shull, I think Mr. McBee has pretty much generally answered all your questions as to how he, what type of formulation, what he relied upon, he testified to market surveys, random sampling and he's given that it is just a, not an exact science, it's just a best estimate. I think . . . he pretty much responded to those questions.

(Tr. 470-71.)

Counsel disagreed with the ALJ, objecting that there were no market surveys produced supporting the numbers specifically cited at the hearing, and that the VE did not establish that he used a satisfactory method for arriving at his estimates. (Tr. 471.) Counsel emphasized that the VE has "not shown any market surveys nor has he shown that his method is peer reviewed, has been tested and can be reproduced by others . . . ." (Tr. 471.) The ALJ responded that he would take counsel's objection into consideration. (Tr. 471.)

2. Analysis

As stated *supra*, a plaintiff seeking DIB bears the burden of proof at steps one through four of the ALJ's sequential five-part inquiry; the burden then shifts to the Commissioner at step five. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At this final step, the Commissioner must establish that the plaintiff's RFC allows her to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1526(c)(2), 404.1566. One way the Commissioner may carry this burden is through the use of vocational expert testimony, provided that such testimony is reliable. *See, e.g., Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).

The Seventh Circuit Court of Appeals has "recognized that the standards by which an

13

expert's reliability is measured may be less stringent at an administrative hearing than under the Federal Rules of Evidence." *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). Yet, "because an ALJ's findings must be supported by substantial evidence, an ALJ may depend upon expert testimony only if the testimony is reliable." *Id.*; *Donahue*, 279 F.3d at 446 ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth."); *see also Britton v. Astrue*, 521 F.3d 799, 803-04 (7th Cir. 2008).

"If the basis of the vocational expert's conclusions is questioned at the hearing . . . then the ALJ should make an inquiry (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable." *Donahue*, 279 F.3d at 446. "A vocational expert is 'free to give a bottom line,' but the data and reasoning underlying that bottom line must be 'available on demand' if the claimant challenges the foundation of the vocational expert's opinions." *McKinnie*, 368 F.3d at 911 (quoting *Donahue*, 279 F.3d at 446). "[T[he data underlying a VE's testimony must be available on demand to facilitate cross-examination and testing of the VE's reliability." *Britton*, 521 F.3d at 804.

Although Polly's attorney raised an objection to the VE's foundation, the ALJ failed to inquire into the reliability of the VE's methodology, sources, and conclusions, as he was required to do under *Donahue* and *McKinnie*. *See McKinnie*, 368 F.3d at 911; *Donahue*, 279 F.3d at 446. In fact, the ALJ *affirmatively prevented* Polly's counsel from conducting an inquiry, interrupting counsel's question to the VE about how he arrived at the number of hand packager jobs and conclusorily deeming the VE's testimony sufficient. (Tr. 471.) Because the record is devoid of any inquiry by the ALJ into the reliability of the VE's methodology, a

14

remand is required on this issue. *See, e.g.*, *Rasnake v. Astrue*, No. 1:08-CV-134-PRC, 2009 WL 1085969, at *20 (N.D. Ind. Apr. 22, 2009) ("[T]he case law in this Circuit is clear that once the basis of the VE's conclusions is questioned at the hearing, the ALJ's duty to make an inquiry into the reliability of those conclusions is triggered." (citing *McKinnie*, 368 F.3d at 991; *Holtz v. Astrue*, No. 07-C-0314-C, 2008 WL 4704187, at *1 (W.D. Wis. Apr. 14, 2008)); *see also Overman v. Astrue*, 546 F.3d 456, 465 (7th Cir. 2008) ("Perhaps [plaintiff's] inquiry into the basis for the VE's testimony could have been more thorough. But a disability adjudication is a hybrid between the adversarial and inquisitorial models, and if the basis of the VE's testimony is questioned at the hearing, then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable[.]" (internal quotation marks and citations omitted)).[6]

In short, because the ALJ failed to satisfy his step five burden of "providing evidence" demonstrating that other work "exists in significant numbers in the national economy" that Polly can perform, 20 C.F.R. § 404.1560(c)(2), the ALJ's step five finding must be remanded.[7]

---

[6] Moreover, Polly correctly argues in her reply brief that the recent Seventh Circuit Court of Appeals case *Liskowitz v. Astrue*, 559 F.3d 736 (7th Cir. 2009), is distinguishable. In *Liskowitz*, the claimant unsuccessfully challenged the reliability of the VE's sources, two of which were published by the United States Department of Labor and the Wisconsin Department of Workforce Development. *Id*. at 743-44. The *Liskowitz* Court was also unpersuaded by the claimant's argument that the VE was required to identify the number of part-time jobs included in her estimation of the number of jobs the claimant was capable of performing. Neither of these issues are in contention in the present case, where Polly has challenged the reliability of the VE's *methods* of extrapolating estimates from the data, not the VE's sources of data and the fact that the VE's materials were not available on demand.

[7] Polly's remaining challenge on appeal is that the ALJ improperly evaluated the medical opinion of Dr. Cyran, her treating psychiatrist. Dr. Cyran opined that Polly had several years of difficult functioning as a parent and an employee despite psychotherapy and medicine management; that she would have problems with focus and concentration reducing performance and increasing risk of damage to people or property and leading to frequent absences; and that the last time she worked she was inconsistent, could not handle job stress, and had frequent absences. (Tr. 341-43.) The ALJ discounted Dr. Cyran's opinion because it conflicted with other medical evidence and, significantly, a statement from the co-owner of the group home where Polly worked indicating that Polly did a good job there. (Tr. 22-24.)

Because the case will be remanded on the step five determination, the Court need not rule on Polly's other argument. A quick review of the ALJ's analysis, however, gives the Court pause. "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and this case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Polly and against the Commissioner.

SO ORDERED.

Enter for this 23rd day of June, 2009.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge

---

*Clifford*, 227 F.3d at 870; *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.") (collecting cases). And here, although the ALJ's discussion of the medical evidence was thorough, he discounted the opinions of each physician of record, ultimately relying on no particular medical opinion in arriving at his RFC determination. Without deciding the issue, we note the possibility that the ALJ "indulged his own lay view" of Polly's psychiatric problems when he determined that Polly's work at the group home was inconsistent with Dr. Cyran's opinion that she would have trouble maintaining employment. *Rohan*, 98 F.3d at 970-71 (holding that the ALJ played doctor in finding that the claimant's efforts to engage in a small business were incompatible with her diagnosis of major depression) (citing *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995)). The Court therefore recommends that the Commissioner address this issue on remand.